# UNITED STATES DISTRICT COURT

### for the

Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  2:21-MJ-05522 |
| 520 Gladys Ave<br>Monterey Park, CA 91755 | ) ) ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1029, 1341, 1343 and 1349 | See affidavit |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
/s Michael Blas

*Applicant's signature*

_____
Michael Blas, Special Agent (DOL-OIG)

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Los Angeles, CA</u>

_____
Hon. Rozella A. Oliver, U.S. Magistrate Judge

*Printed name and title*

AUSA Ranee A. Katzenstein, x2432, 11th Floor

## **ATTACHMENT A-1**

### **Property To Be Searched**

The **SUBJECT PREMISES** is a residential property located at 520 Gladys Ave, Monterey Park, CA 91755. The **SUBJECT PREMISES** is a one-story house that is painted yellow with grey-green trim. The numerals "520" are affixed to the trim of the house on the edge of the roof above the main entrance. The front door faces north and contains a security screen door painted black. The front of the property facing Gladys Avenue is bordered by a low wall made of blocks that topped with a metal fence painted green. A wall made of the same blocks runs along the driveway on the north side of the house. The **SUBJECT PREMISES** also includes a separate two-story casita behind the main house.  The casita is painted white.  There is a white awning extending the width of the building that is attached to the roofline of the south side of the casita and another white awning extending almost the full width of the building above the ground floor, also on the south side of the building.  There is a staircase leading to the second floor on the south west corner of the casita.  A portion on the south east of the first floor of the casita serves as a carport. The property contains two driveways. One driveway is on the north side of the property and leads to the front door and garage of the main house. The second driveway is on the south side of the property and leads towards the rear of the property where the casita is located.

The **SUBJECT PREMISES** includes all attached and unattached

rooms, attics, garages, vehicles in the garage and driveway, storage areas and units, boxes, safes, lockers, bags, trash bins or bags, trash areas, mailboxes, any other common areas associated with the premises (such as a common mail receiving area), and any containers found in the aforementioned areas.

The **SUBJECT PREMISES** are further described in the photos comprising Exhibit 1, below.

EXHIBIT 1







**ATTACHMENT B**

**I.   ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband,
fruits, and/or instrumentalities of violations of violations of
Title 18, United States Code, Sections 1029 (Fraud and related
activity in connection with access devices); 1341 (Mail Fraud);
1343 (Wire Fraud); and 1349 (Attempt and Conspiracy to Commit
Mail Fraud and Wire Fraud):

a.   For the period of March 1, 2020, to the present,
records, documents, correspondence, faxes, and e-mails sent to
and/or received from, or related to the business of, any State
Workforce Agency[7] including the California Employment Development
Department, including any applications for Unemployment
Insurance.

b.   For the period of January 1, 2020, to the
present, records and documents, including correspondence, faxes,
and e-mails, containing information, including Personally
Identifiable Information, e.g., names, Social Security Numbers,
dates of birth, addresses, phone numbers, and driver's license
numbers, to be used or that could be used in support of any
application for Unemployment Insurance, and/or any claim of
continuing eligibility for Unemployment Insurance.

---

[7] The Department of Labor defines and links to State
Workforce Agencies at:
https://www.dol.gov/agencies/eta/wotc/contact/state-workforce-agencies (last visited Oct. 12, 2021).

      c.     For the period of March 1, 2020, to the present, checks and EBP cards received from any State Workforce Agency including the California Employment Development Department.

      d.     Copies of and actual driver licenses, state identification cards, passports, and other forms of identification in names other than **CAO**'s name or in **CAO**'s name but bearing another person's PII and/or photographs.

      e.     Indicia of occupancy, residency, control, and/or ownership of the **SUBJECT PREMISES**, including utility bills, telephone bills, loan payment receipts, rent documents, keys, photographs, and bank records.

      f.     For the period of March 1, 2020, to the present, bank records or records received from financial institutions, including debit cards; correspondence regarding debit card accounts; wire transfer records; bank statements and associated transactional records; money drafts; letters of credit; safety deposit box keys and records; checkbooks; money wrappers; money containers; income tax records; payroll records; credit cards; and any other records of financial transactions that reflect the disposition and/or allocation of monies.

      g.     Cash or cash equivalents such as pre-paid cards in excess of $500.

      h.     For the period of March 1, 2020, to the present, records relating to the acquisition, secreting, transfer, concealment, and/or expenditure of money.

   i. Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the **SUBJECT OFFENSES**, and forensic copies thereof.

   j. With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

    i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

    ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    iii. evidence of the attachment of other devices;

    iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

    v. evidence of the times the device was used;

    vi. passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

    vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and

manuals, that may be necessary to access the device or to conduct a forensic examination of it;

             viii.    records of or information about Internet Protocol addresses used by the device;

             ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to

store digital data (excluding analog tapes such as VHS); and security devices.

## II.  SEARCH PROCEDURE FOR DIGITAL DEVICES

4.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to

determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

        ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

        c.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

        d.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

        e.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

        f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the

other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offenses listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.   During the execution of this search warrant, law enforcement is permitted to: (1) depress **CAO's** thumbs and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of **CAO's** faces with their eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use

excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**AFFIDAVIT**

I, Michael Blas, being duly sworn, declare and state as follows:

## I.  INTRODUCTION

1.    I am a Special Agent with the United States Department of Labor's Office of Inspector General ("DOL-OIG") and have served in this capacity for fifteen years. I am presently assigned to the Los Angeles Regional Office of DOL-OIG. My responsibilities as a DOL-OIG Special Agent include investigating unemployment-insurance fraud, mail fraud, wire fraud, and identity theft, along with other related crimes.

2.    I am also a graduate of the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia. As part of the training provided at FLETC, I successfully completed the Basic Training course, which included, but was not limited to, courses in criminal and constitutional law.

3.    From my training and experience, I am familiar with the criminal methods and means used by persons devising and executing schemes to defraud federal and state unemployment systems.  Through my participation in numerous investigations into fraudulent schemes used to obtain unauthorized unemployment insurance benefits, I am aware of the telltale signs of fraudulent benefits filings and the ways in which digital devices are employed to plan and execute such schemes.

## II. PURPOSE OF AFFIDAVIT

4.    This affidavit is made in support of an application for warrants to search the following:

      a.   The residence located at 520 Gladys Ave, Monterey Park, CA 91755 (the **"SUBJECT PREMISES"**), as further described in Attachment A-1.

      b.   The person of **Jian Cao** (**"CAO"**), as further described in Attachment A-2.

    5.   The requested warrants seek authorization to search the **SUBJECT PREMISES** and **CAO's person** and seize evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1029 (Fraud and related activity in connection with access devices); 1341 (Mail Fraud); 1343 (Wire Fraud); and 1349 (Attempt and Conspiracy to Commit Mail Fraud and Wire Fraud) (collectively, the **"SUBJECT OFFENSES"**), as described more fully in Attachment B.  Attachments A-1, A-2, and B are incorporated herein by reference.

    6.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law-enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. PREMISES TO BE SEARCHED

    7.   The **SUBJECT PREMISES** is a residential property located at 520 Gladys Ave, Monterey Park, CA 91755, as described more

fully in Attachment A-1 and as shown in the photographs attached as Exhibit 1.

8.   The person of **CAO** is a male who is approximately 62 years old, stands approximately 5'6" tall and weighs approximately 137 lbs.  **CAO** is more fully described in Attachment A-2, which includes a photograph of **CAO**.

### III. SUMMARY OF PROBABLE CAUSE

9.   As part of its response to the COVID-19 pandemic, Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which provided over $2 trillion in economic relief, including the Pandemic Unemployment Assistance ("PUA") program. Federally funded unemployment-insurance ("UI") benefits, including those authorized under the PUA, are administered in California by the California Employment Development Department ("EDD").

10.   The DOL-OIG, the EDD Investigations Division, the U.S. Homeland Security Investigations, United States Secret Service", United States Postal Inspection Service, and Federal Bureau of Investigation have learned of a rash of fraudulent schemes in which perpetrators take advantage of the CARES Act's PUA to fraudulently obtain public benefits by submitting applications that provide false information in order to make it appear that the claimants named in the applications are entitled to benefits under these programs when, in fact, they are not.

11.   This investigation has obtained evidence that a resident or possibly multiple residents of the **SUBJECT PREMISES**

are participating in such a scheme to defraud EDD. This evidence
includes the following:

        a.    The **SUBJECT PREMISES** was used as the mailing
address for the named claimant for 120 UI applications filed with
the California EDD.

        b.    Thirty-six of the UI applications listed the
**SUBJECT PREMISES** as the named claimant's business address.  Eight
additional applications listed the **SUBJECT PREMISES,** but
specified the casita identified as "Apartment A" or "Apartment
B," as the named claimant's mailing address.

        c.    Three of the applications were filed from the
same IP address, which is associated with the **SUBJECT PREMISES.**
Two further applications were filed from a second IP address that
is associated with "Apartment B" at the **SUBJECT PREMISES.**

        d.    The occupation identified on most of these claims
is "self-employed."

        e.    A number of the named claimants appear to reside
outside of California and therefore fail EDD's California-
residency requirements for eligibility for UI benefits.

    12.  From my training and experience, I know that multiple
UI claims filed from the same physical location, using the same
IP address, and/or bearing the same aforementioned
characteristics, such as occupation, are typically fraudulent
whether or not the named claimants are aware of or are
participating in such fraud.

    13.  **CAO** resides at the **SUBJECT PREMISES,** which is the
address on his California Driver's License and the address

provided on an application for UI benefits that was filed in **CAO's** own name.  **CAO** has been observed at the **SUBJECT PREMISES** as recently as November 24, 2021.

14.  From March 24, 2020, to the present, EDD has paid out approximately $1,327,653 in UI benefits under the PUA program on the 120 claims using the **SUBJECT PREMISES** as the named claimant's mailing address.

15.  EDD contracts with Bank of America to provide UI benefits through Bank of America debit cards that are mailed to the addresses listed by UI claimants on their applications.  I have compared ATM surveillance photos of withdrawals being made using at least 16 of the debit cards mailed to the **SUBJECT PREMISES** with the photo on CAO's California Driver's License and have determined that the person making the withdrawals is the person who appears on **CAO's** Driver's License.

### IV. STATEMENT OF PROBABLE CAUSE

**A.   Background for CARES and UI-EDD Claims**

    1.   Legal framework

16.  Since 1935, the U.S. Department of Labor's UI program has provided unemployment benefits to eligible workers who become unemployed through no fault of their own. This program ensures that at least a significant portion of the necessities of life -- most notably food, shelter, and clothing -- are met on a weekly basis while the worker seeks employment. UI beneficiaries who meet the requirements of the applicable state law are eligible for this temporary financial assistance. Each state administers a separate UI program within the guidelines

established by Federal law. In the state of California, EDD administers the UI program for residents and others physically performing work activities in California.

17.   Generally speaking, regular UI claimants must be: 1) unemployed through no fault of their own; 2) able and available for work; 3) willing to accept suitable work; and 4) actively seeking work.

18.   On March 13, 2020, the President of the United States declared COVID-19 an emergency under the Robert T. Stafford Disaster Relief and Emergency Assistance Act. As a result, Congress passed the CARES Act, which the President signed into law on March 27, 2020. The CARES Act provided over $2 trillion in economic relief protections to the American people from the public health and economic impacts of COVID-19.

19.   Prior to the enactment of the CARES Act, to be eligible for UI administered by EDD, a person must have been employed and worked in California and received at least a certain amount of wages from an employer in the 18 months preceding his/her UI benefits claim. Because of this requirement, self-employed workers, independent contractors, and employees with insufficient earnings were not eligible to receive regular UI benefits.

20.   The CARES Act established a new program—the PUA—to provide unemployment benefits during the COVID-19 pandemic to people who would not otherwise qualify for regular UI benefits including business owners, self-employed workers, independent contractors, and those with a limited work history who were out

of business or had significantly reduced their services as a
direct result of the pandemic. UI benefits provided under the
PUA program are sometimes referred to as PUA benefits.

21.   Under the PUA provisions of the CARES Act, a person
who was a business owner, self-employed worker, independent
contractor, or gig worker could qualify for PUA benefits
administered by EDD if he/she previously performed such work in
California and was unemployed, partially unemployed, unable to
work, or unavailable to work due to a COVID-19-related reason.[1]
Examples of non-business-owner occupations that might qualify a
person for PUA benefits are realtor, barber, hairstylist,
freelance photographer, construction handyman/woman, gardener,
and ride-share driver.[2]

_____

[1] COVID-19 related reasons for being out of work include:
being diagnosed with COVID-19 or experiencing symptoms of COVID-
19 and seeking a medical diagnosis; being unable to work because
a health care provider advised self-quarantining due to concerns
related to COVID-19; having a household member who has been
diagnosed with COVID-19; providing care for a family or
household member who has been diagnosed with COVID-19; having
primary caregiving responsibility for a child or other household
member who is unable to attend school or another facility that
is closed as a direct result of the COVID-19 and the school or
facility care is required for the claimant to work; becoming the
breadwinner or major support for a household because the head of
household died due to COVID-19; the claimant has quit his/her
job due to COVID-19; the place of employment has closed due to
COVID-19; a job that the claimant was scheduled to start is no
longer available due to the COVID-19 public health emergency; or
the place of employment is inaccessible due to the COVID-19
public health emergency.

[2] To be eligible, such person must also not be participating
in the UI Elective Coverage program.  Under the provisions of
the California Unemployment Insurance Code (CUIC), employers may
elect Unemployment Insurance (UI) and State Disability Insurance
(SDI) or only Disability Insurance (DI) coverage for themselves.
Self-employed individuals, who are not employers, may only elect
SDI coverage for themselves.

22.   EDD began accepting applications for PUA benefits on April 28, 2020. To make benefits available as quickly as possible, payments were issued in phases. If a claimant qualified for PUA benefits, the minimum payments were as follows based on the claim's start date:

Phase 1: For claims with start dates falling between February 2 and March 28, 2020, inclusive, $167 per week for each week the claimant was unemployed due to COVID-19.

Phase 2: For claims with start dates falling between March 29 and July 25, 2020, inclusive, $167 plus $600 per week for each week the claimant was unemployed due to COVID-19.

Phase 3: For claims with start dates falling between July 26 and December 26, 2020, inclusive, $167 per week for each week the claimant was unemployed due to COVID-19.

Phase 4: For claims with start dates falling between December 27, 2020, and the end of the program, $167 plus $300 per week for each week the claimant was unemployed due to COVID-19.

23.   Claimants could qualify for UI benefits under the PUA program for up to a total of 57 weeks (minus any regular UI and FED/ED benefits received).

24.   UI applicants could be eligible for more than the minimum weekly benefit amount of $167 if their annual income for 2019 reported on the PUA application met a minimum threshold.

25.   A UI claimant could usually collect 26 weeks of regular state UI benefits. The CARES Act provided for additional Pandemic Emergency Unemployment Compensation ("PEUC"), which provided up to 13 weeks of additional payments, for a total of 39 weeks of benefits. PEUC was available to persons who were fully or partially unemployed at any time between March 29 and December 26, 2020. Persons with a regular UI claim, a PUA claim or a PEUC extension filed between March 29 and July 25, 2020, also received Federal Pandemic Unemployment Compensation ("FPUC"), which was an extra $600 per week.

26.   On August 8, 2020, after FPUC expired, the President signed a Presidential Memorandum authorizing FEMA to use disaster relief funds pursuant to Section 408 Other Needs Assistance of the Stafford Act to provide supplemental payments for lost wages to help ease the financial burden on individuals who were unemployed as a result of COVID-19. The "Lost Wages Assistance Program" ("LWAP") served as a temporary measure to provide an additional $300 per week via a total of $44 billion in FEMA funds. The period of assistance for LWAP was August 1, 2020 to December 27, 2020, or termination of the program, whichever was sooner.

27.   On December 27, 2020, the President signed into law the Consolidated Appropriations Act of 2021. The law extended certain programs first authorized by the CARES Act and created a new UI benefit for "mixed earners."

a.   The law extended the PUA program to those weeks of unemployment ending on or before March 14, 2021. In states

where the week of unemployment ends on a Sunday, the last payable week of PUA was the week ending March 14, 2021 (March 13 if weeks of unemployment end on Saturday). For individuals on PUA who had not exhausted their benefit eligibility of up to 50 weeks, the program also provided for continuing benefits for eligible individuals for weeks of unemployment through April 5, 2021. The law also strengthened documentation requirements to ensure PUA program integrity.

b.    FPUC, which expired July 31, 2020, was reauthorized and modified to provide $300 per week to supplement benefits for weeks of unemployment beginning after December 26, 2020, and ending on or before March 14, 2021. FPUC was not payable with respect to any week during the gap in applicability, that is, weeks of unemployment ending after July 31, 2020, through weeks of unemployment ending on or before December 26, 2020.

c.    On March 21, 2021 the President signed into law the American Rescue Plan Act (ARPA) of 2021. The law extended certain programs first authorized by the CARES Act beyond the expiration date of March 14, 2021 to September 6, 2021.

d.    FPUC, which expired on March 14, 2021, was reauthorized to provide $300 per week through the week ending on or before September 6, 2021.

e.    The law extended the benefit for "mixed earners" through the week ending on or before September 6, 2021. In states where the week of unemployment ends on a Saturday, the last week of unemployment for which MEUC may be paid is the week

ending on September 4, 2021. In states where the week of
unemployment ends on a Sunday, the last week of unemployment for
which MEUC may be paid is the week ending on September 5, 2021.

    2.   Procedures for Applying for and receiving UI
       under the PUA Program

28.  Generally, persons applying for UI benefits under the
PUA program between April 2020 and November 2020 were not
required to submit any supporting documents to the EDD with
their applications. Claimants entered their total income for the
preceding calendar year on the application. The stated income
was used as a basis for paying the minimum benefits of $167 per
week. EDD could request documentation to provide proof of the
stated income.[3]  If the income information provided by the UI
claimant met an annual earnings threshold of $17,368 or more,
the EDD would work as quickly as possible to verify the
claimant's income using other resources available to EDD in
order to increase the weekly benefit amount.

29.  Like regular UI claims, PUA claims could be filed
online. When an individual filed a PUA claim online, EDD
automatically maintained certain information regarding the
filing of the claim, including the date and time the claim was
submitted, the name of the person for whom the claim was filed,
and the IP address of the computer, or ISP account, that was
used to file the claim.

---

[3] EDD accepts annual tax returns, Forms 1099 and W-2, pay
stubs and similar items as proof of income.

30.   A claimant was required to answer various questions to establish his/her eligibility for PUA benefits. The claimant was required to provide his/her name, Social Security Number, and mailing address. The claimant was required to also identify a qualifying occupational status and COVID-19 related reason for being out of work.

31.   After it accepted a UI claim, including a claim submitted pursuant to the PUA program, EDD typically deposited UI funds every two weeks to an Electronic Bill Payment ("EBP") debit card administered by Bank of America ("BofA"), which the claimant could use to pay for his/her expenses. The EBP card would be sent via the U.S. Postal Service to the claimant at the address the claimant provided in his/her UI claim. Claimants could activate their debit card over the phone or online.

32.   When receiving regular UI benefits, a claimant was required to complete a Continued Claim Form ("DE 4581") and certify every two weeks, under penalty of perjury, that he/she remained unemployed and eligible to receive UI benefits. EDD authorized and deposited payment to the EBP debit card after it received the Continued Claim Form. On or about April 23, 2020, the California Secretary of Labor directed the EDD to temporarily suspend the requirement for UI claimants to provide unemployment certifications (Continued Claim Forms).[4]  The Continued Claim Form was waived to prevent any unnecessary delays in dispensing benefit payments.

_____

[4] The temporary suspension of the continued claims forms covered the weeks ending March 14, 2020 through May 9, 2020.

33.   Weekly PUA benefits typically ranged from $167 to $450.  In order to receive the maximum weekly benefit of $450, a claimant must have earned $11,674.01 or more in the highest quarter of the claimant's base employment period.

34.  Because PUA claims did not require supporting documentation from April 2020 to November 2020, PUA became a prime target for fraud.

       3.   Methods and Characteristics Common to Fraudulent Claims UI Claims

35.  Based on my training and experience investigating fraudulent applications for unemployment insurance benefits, I know that fraudulent UI claims generally follow patterns, including, among others:

       a.   Using the identities of other people to file for fraudulent UI benefits in the other persons' names and then collecting the UI funds. In some instances, the named claimants are victims of identity theft; in other instances, the named claimants have participated in the scheme by providing their personal identifying information to the schemers in exchange for a portion of the fraudulent benefits obtained; in yet other instances, the named claimants believe they may be entitled to benefits but do not know that the schemers are reporting false information to EDD to fraudulently increase the amount of the benefits claimed. In most instances the fraudulently obtained UI benefits are accessed through ATM withdrawals.

       b.   Submitting UI applications listing addresses under the control of the persons perpetrating the scheme so that

EBP debit cards and other EDD correspondence will be mailed to these addresses and thus be accessible to the schemers.

**B.    The Suspect UI claims and their connections to the SUBJECT PREMISES and CAO**

36.    In or about November 2020, I learned from an analysis conducted by DOL-OIG and my review of that analysis with EDD Criminal Investigator ("EDD-CI") Ignacio Romo that the **SUBJECT PREMISES** had been provided as the named claimant's mailing address on 102 UI applications. I later learned that EDD-CI had found an additional 18 UI applications using this same address, for a total of 120 UI applications (the "Suspect UI Applications").  EDD's analyses show that from March 24, 2020, to the present, EDD has paid out approximately $1,327,653 in UI benefits under the PUA program on the 120 claims using the **SUBJECT PREMISES** as the named claimant's mailing address.

37.    The first of the Suspect UI Applications was filed on March 25, 2020.  The Suspect UI Applications continued to be filed through August 16, 2021.

38.    Three of the Suspect UI Applications were submitted from IP address 47.6.81.244.  According to records I have reviewed from Charter Communications, "JIAN CAO" was the subscriber for IP address 47.6.81.244 at the time the UI claims are submitted online to EDD from this IP address. The internet-service address listed on the account is the **SUBJECT PREMISES.**

39.    Two of the Suspect UI Applications were submitted from IP address 71.93.223.145.  According to records I have reviewed from Charter Communications, "JIAN QUAN CHEN" was the subscriber

for IP address 71.93.223.145 at the time the UI claims were submitted online to EDD from this IP address.  The internet service address listed on the account is the casita (identified as "Apartment B") on the **SUBJECT PREMISES**.

40.  The remaining 115 Suspect UI Applications were submitted on-line from multiple IP addresses, almost all of which are associated with locations in the San Gabriel Valley, which is the geographic area in which the **SUBJECT PREMISES** are located and where, as explained below, **CAO** is believed to reside.

41.  Based on my investigation, I believe that **CAO** resides at the **SUBJECT PREMISES**.  For example:

a.  **CAO**'s California Department of Motor Vehicles ("DMV") driver's license with an expiration date of August 23, 2026, identifies the **SUBJECT PREMISES** as **CAO**'s residential address.

b.  According to EDD, **CAO** provided the **SUBJECT PREMISES** as his mailing address on a UI claim filed in his own name.

c.  On November 12, 2021, I conducted surveillance at the **SUBJECT PREMISES** and observed a Lexus SUV bearing California license plate number 8UGS051 parked in the driveway of the **SUBJECT PREMISES**.  According to the California DMV, the vehicle is registered to **CAO**.  The address listed on the DMV registration is the **SUBJECT PREMISES**.

d.  I conducted additional surveillance on November 24, 2021.  A man who appeared to be the same person as appears in

the photo on **CAO**'s California Driver's License was standing in the driveway.  A woman was also present standing in the driveway.

###    C.    Suspect Characteristics of Certain Claims

42.  I have reviewed the Suspect UI Applications.  I ran the named claimants and determined that 10 of the named claimants appeared to live outside of California even though they provided the **SUBJECT PREMISES** as the mailing address on their UI applications. All of the ten claims provided similar information, as follows:

a.   All 10 of the applications reported that the named claimant was unemployed because of a "disaster," namely COVID-19.

b.   All 10 of the applications selected the following self-attestation for the named claimant: "You are an independent contractor with reportable income (ex. IRS Form 1099) and you are forced to stop working because COVID-19 has severely limited your ability to continue performing your customary work activities." Or "Your place of employment is closed as a direct result of the COVID-19 public health emergency."

c.   Five of the 10 applications listed the **SUBJECT PREMISES** as the physical address of the named claimant's business; three of the 10 applications listed no business address.

43. I also learned the following about the named claimants on the ten applications I reviewed[5]:

---

[5] As set forth below, although none of the ten named claimants resided at the **SUBJECT PREMISES** at the time the UI

CLAIMANT L.C.

44.  I consulted law enforcement databases regarding the
information provided for L.C. on the PUA claim filed in L.C.'s
name, and learned the following:

a.  The databases do not reflect any current or prior
residential address for L.C. in California.

CLAIMANT B.Z.

45.  I consulted law enforcement databases regarding the
information provided for B.Z. on the PUA claim filed in B.Z.'S
name, and learned the following:

a.  The databases do not reflect any current
residential address for B.Z. in California. The databases
reflect that B.Z. used the **SUBJECT PREMISES** as his/her mailing
address in 2019, but has resided in Winston Salem, NC, since
that time.

CLAIMANT F.W.

46.  I consulted law enforcement databases regarding the
information provided for F.W. on the PUA claim filed in F.W.'s
name, and learned the following:

a.  The databases do not reflect any current
residential address for F.W. in California. The databases
reflect that F.W. used the **SUBEJECT PREMISES** as his/her mailing

---

applications using the **SUBJECT PREMISES** as a mailing address
were submitted, eight of the ten named claimants appear to have
resided in 2018 or 2019 at the **SUBJECT PREMISES**.  On May 21,
2021, I was informed by Special Agents with Homeland Security
Investigations that they were conducting an investigation of
alleged human trafficking involving the **SUBJECT PREMISES.**

address in 2018, but has resided in Arlington, TX since that time.

CLAIMANT G.H.

47.   I consulted law enforcement databases regarding the information provided for G.H. on the PUA claim filed in G.H.'s name, and learned the following:

        a.   The databases do not reflect any current residential address for G.H. in California. The databases reflect that G.H. used the **SUBJECT PREMIES** as his/her mailing address in 2018, but has resided in Hildebran, NC since that time.

CLAIMANT H.C.

48.   I consulted law enforcement databases regarding the information provided for H.C. on the PUA claim filed in H.C.'s name, and learned the following:

        a.   The databases do not reflect any current residential address for H.C. in California. The databases reflect that H.C. used the **SUBJECT PREMISES** as his/her mailing address in 2018, but has resided in Flushing, NY since that time.

CLAIMANT H.Z.

49.   I consulted law enforcement databases regarding the information provided for H.Z. on the PUA claim filed in H.Z.'s name, and learned the following:

        a.   The databases do not reflect any current residential address for H.Z. in California. The databases reflect that H.Z. used the **SUBJECT PREMISES** as his/her mailing

address in 2018, but has resided in Arlington, TX since that time.

<u>CLAIMANT Q.Q.</u>

50.  I consulted law enforcement databases regarding the information provided for Q.Q. on the PUA claim filed in Q.Q.'s name, and learned the following:

a.  The databases do not reflect any current residential address for Q.Q. in California. The databases reflect that Q.Q. used the **SUBJECT PREMISES** as his/her mailing address in 2018, but has resided in Midland, TX since that time.

<u>CLAIMANT Q.L.</u>

51.  I consulted law enforcement databases regarding the information provided for Q.L. on the PUA claim filed in Q.L.'s name, and learned the following:

a.  The databases do not reflect any current residential address for Q.L. in California. The databases reflect that Q.L used the **SUBJECT PREMISES** as his/her mailing address in 2018, but has resided in Harrah, OK since that time.

<u>CLAIMANT R.L.</u>

52.  I consulted law enforcement databases regarding the information provided for R.L. on the PUA claim filed in R.L.'s name, and learned the following:

a.  The databases do not reflect any current residential address for R.L. in California. The databases reflect that R.L. used the **SUBJECT PREMISES** as his/her mailing address in 2018, but has resided in Fairfax, VA since that time.

<u>CLAIMANT S.L.</u>

53.   I consulted law enforcement databases regarding the information provided for S.L. on the PUA claim filed in S.L.'s name, and learned the following:

a.   The databases do not reflect any current residential address for S.L. in California. Instead, the databases reflect that S.L. resides in New York. There is no record of S.L. residing at the **SUBJECT PREMISES**.

**D.   Bank of America ATM Surveillance Photos**

54.   I have reviewed the BofA ATM surveillance footage of transactions done with EDD EBP debit cards mailed to the **SUBJECT PREMISES**.[6]  Based on my review, I believe that the same person made cash withdrawals using the debit cards issued to multiple claimants for whom the **SUBJECT PREMISES** were listed as the mailing address, namely claimants L.I., W.L., G.H., G.L., L.G., Y.C., Y.H., H.L, C.M., Q.L, S.L., Q.H., S.H., H.C., and J.H. I also compared the ATM surveillance photos with **CAO's** CA driver's license photo.  Based on this comparison, I believe that **CAO** is the person who appears in the ATM surveillance photos making the withdrawals.  I also compared the aforementioned ATM surveillance photos with the ATM surveillance footage of transaction made with the EDD EBP debit card issued to **CAO**.  I believe that both sets of photos/footage show the same person, namely **CAO**.

_____

[6] ATM surveillance photos bear date and time stamps that can be matched to records maintained by BofA of transactions on individual accounts.

**E.   Use of Digital Devices**

55.   Based on my training and experience investigating UI fraud, I know that digital devices are typically employed in connection with fraudulent UI schemes.

56.   As explained above, all 120 Suspect UI Applications were submitted to EDD on-line, i.e., via a digital device.

57.   Moreover, as set forth above, at least five of the Suspect UI Applications were submitted from IP addresses registered to the **SUBJECT PREMISES**.

58.   Based on my training and experience and my discussions with other agents who have training and experience on computer crimes and access device fraud, I know the following:

a.   Individuals involved in computer crimes and access device fraud often use portable digital devices – such as laptop computers, smartphones, and external thumb drives – to perpetrate their schemes and to store records and information related to their crimes on those devices. I also know that people in general, and individuals involved in computer crimes in particular, tend to keep their personal digital devices in locations where they are easily located, readily accessible, and close at hand, such as in a pocket, a backpack, a car, or their home. For this reason, among others, this application seeks permission to search the person of **CAO** in addition to a search of the **SUBJECT PREMISES**. Because such devices are considered items of value, I know that people in general, and individuals involved in computer crimes in particular, do not commonly

discard their devices even when changing residences, instead keeping them nearby to assure their safety and security.

b.   It is common practice for individuals involved in computer and financial crimes to keep the evidence, fruits and instrumentalities of their crimes in a place that is private, secure, and easily accessible, such as: (i) a residence or a car; (ii) onsite or offsite storage units, safes, or lockers; (iii) post office boxes; and/or (iv) boxes, lockers or other space maintained at commercial mail receiving companies. Onsite and offsite storage, and offsite post office boxes, lockers and other space maintained at commercial mail receiving companies and other storage facilities are used, among other reasons, for security and anonymity purposes, to maintain records in secure (and potentially anonymous or pseudonymous) locations in the event that property is compromised and/or becomes vulnerable to search, seizure, or destruction by hackers, the government, or natural disaster. Secure and offsite storage can also be used to try to hide evidence associated with criminal activity.

c.   Individuals involved in computer and financial crimes often use fake, borrowed, or stolen identities to commit these crimes to try to hide their involvement in the criminal activity, sometimes using sophisticated and technical means to try to mask their real identities. The evidence of such identity theft includes real and forged state identification documents (including drivers' licenses and identification cards), passports, social security cards, tax documents and other financial records, computer records (including email records and

account names) and programs and software, and related documents
– all in names other than the perpetrators' real names.

       d.    Individuals committing computer and financial
crimes also use and maintain digital devices to store
information about their crimes during and long after the crimes
have been committed. This information includes logs of
fraudulent transaction history; records of funds received;
information regarding individuals and companies that have been
victimized; records of payments from co-conspirators; and victim
profiles. Such "profiles" contain the personal identifying
information of identity victims, such as names, Social Security
numbers, dates of birth, driver's license or state
identification numbers, alien registration numbers, passport
numbers, employer or taxpayer identification numbers, and public
and private addresses and keys.

    59.  For these reasons, I believe that digital devices
found on the person of **CAO** and at the **SUBJECT PREMISES** will
contain evidence of the scheme herein described and constitute
instrumentalities of the same.

        **V.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

    60.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

    61.  Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet. Normally,

when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

62. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

63. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

64. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

65. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

66. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

67. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

68.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

69.  Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

70.  In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

71.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress **CAO**'s thumb and/or fingers on the

device(s); and (2) hold the device(s) in front of their faces with their eyes open to activate the facial- iris and/or retina-recognition feature.

72. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. <u>CONCLUSION</u>

73. For all the reasons described above, there is probable cause to believe that:

74. **CAO** has committed violations of Title 18, United States Code, Sections 1029 (Fraud and related activity in connection with access devices), 1341 (Mail Fraud), and 1343 (Wire Fraud); and

///

///

///

75. Evidence, fruits and instrumentalities of violations of Title 18, United States Code, Sections 1029 (Fraud and related activity in connection with access devices), 1341 (Mail Fraud), 1343 (Wire Fraud) as described in Attachment B of this affidavit, will be found in a search of the **SUBJECT PREMISES** and the persons of **CAO,** as further described above and in Attachments A-1 and A-2 of this affidavit.

Attested to by the applicant in accordance with
the requirements of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of December, 2021.


_____
UNITED STATES MAGISTRATE JUDGE